IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TAMMY GOODWIN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 06-1293 |
| | ) | Judge Terrence F. McVerry/ |
| COMMISSIONER OF SOCIAL | ) | Magistrate Judge Amy Reynolds Hay |
| SECURITY, | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

I.    RECOMMENDATION

It is respectfully recommended that the Cross Motions for Summary Judgment submitted by the parties [Docs. 11, 13] be denied. It is further recommended that the decision of the Commissioner be reversed and the case be remanded to the Commissioner for further consideration.

II.    REPORT

A.    Procedural History

Plaintiff, Tammy Goodwin, brought this action under 42 U.S.C. § 1383(c), which incorporates § 405(g), seeking review of the Commissioner of Social Security's final decision disallowing her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383f.

In her application for benefits filed on October 4, 2004, Plaintiff claimed an onset of disability of January 1, 1985, due to depression, anxiety attacks, emotional problems and back and leg pain (Tr. 13, 61-62). The state agency denied her claims on March 14, 2005, and on May

11, 2005, Plaintiff requested a hearing before an administrative law judge ("ALJ") (Tr. 26-32, 33).

A hearing was held on January 26, 2006, at which time Plaintiff, who was represented by counsel, and a vocational expert ("VE") were called to testify (Tr. 214-263). The ALJ issued a decision on June 7, 2006 (Tr. 11-23), finding that Plaintiff is capable of performing a range of light work that exists in the national economy and, thus, is not disabled as defined under the Act (Tr. 20-21).[1] The Appeals Council denied Plaintiff's request for review on July 26, 2006, making the ALJ's decision the final decision of the Commissioner (Tr. 5-7).

B.      Medical History[2]

Plaintiff was evaluated by Daniel Gorman, M.S., at the request of the Department of Public Assistance on September 24, 2003. Although prior to the time frame relevant to these proceedings, Plaintiff reported that she experiences headaches and panic attacks approximately every other day and complained of occasional back pain due to a crushed disc and a herniated disc (Tr. 131). Mr. Gorman conducted a Wechsler Adult Intelligence Scale test which indicated that Plaintiff had a Full Scale IQ of 72, a Verbal IQ of 71, and a Performance IQ of 76. Mr. Gorman concluded that Plaintiff functioned within the borderline range of intellectual functioning (Tr. 132-33).

---

[1]      We note here that, notwithstanding the fact that Plaintiff has alleged disability since January of 1985, the agency regulations preclude the receipt of SSI benefits for any month prior to that in which an application is filed. As such, the period relevant to Plaintiff's claim for SSI is from October 4, 2004, the date she filed her application, until June 7, 2006, when the ALJ issued his decision. See 20 C.F.R. § 416.335. See also 20 C.F.R. § 416.305.

[2]      The recitation of Plaintiff's medical history has been largely taken from defendant's brief which appears to comprehensively and accurately reflect the evidence of record and is undisputed by Plaintiff.

Although Mr. Gorman reported that feelings of anxiety were evident throughout the session, he also observed that Plaintiff followed directions well, reacted realistically when she realized she could not answer more difficult questions, displayed good attention skills during the evaluation, and was cooperative (Tr. 133). Mr. Gorman concluded that these observations reflected a valid estimate of Plaintiff's current level of functioning (Tr. 133).

Mr. Gorman's personality assessment suggested that Plaintiff frequently experienced difficulty with anxiety and depression (Tr. 135). He recommended job training readiness courses to help her transition back to employment, continued individual therapy to learn strategies to help her interact more positively with others and deal with stressors, and for her to communicate with her physician about her level of anxiety so that her medication could be optimized (Tr. 136).

Plaintiff was examined by Nabil Jabbour, M.D., on February 10, 2005, at the request of the state agency that makes disability determinations for the Social Security Administration. Plaintiff claimed that she suffered from depression for the past three years and had constant low back pain which was mild to severe (Tr. 155). Plaintiff reported living with her son and having eight alcoholic drinks monthly (Tr. 155).

Dr. Jabbour's exam revealed that Plaintiff had full range of motion in all joints without swelling or tenderness, intact sensation, no motor deficits, the ability to bend forward, and normal function for sitting, standing, walking, lifting, and grasping but had lumbar spine tenderness and a limited ability to fully squat or walk on her toes and heels due to back pain (Tr. 156-57). Dr. Jabbour diagnosed depression and low back pain (Tr. 157).

On March 4, 2005, state agency consultant Dilip S. Kar, M.D., reviewed

Plaintiff's file and concluded that, as of that date, she could perform the exertional demands of medium work (Tr. 159). Dr. Kar cited the normal findings contained in Dr. Jabbour's examination report in explaining his conclusion (Tr. 159). It appears that Plaintiff's file was also reviewed by state agency consultant Roger Glover, Ph.D., in March of 2005, who concluded that her mental impairments were not of disabling severity (Tr. 166-78). Dr. Glover found that Plaintiff's depressive disorder and anxiety disorder satisfied the diagnostic criteria of Listings 12.04 and 12.06, respectively, but concluded that there was insufficient evidence to indicate that Plaintiff was disabled (Tr. 169, 171, 178).

Plaintiff was seen by Emilio Navarro, M.D., at a pain clinic four times between February and April of 2005 complaining of neck pain, stiffness and lower back pain (Tr. 207-11). Plaintiff initially reported anxiety agitation and occasional sleeplessness but denied depression and hopelessness (Tr. 210). She also reported that she did not drink alcohol (Tr. 210). X-rays revealed some degenerative changes at the C3-4, C4-5 levels and L5-S1 level and Oxycontin was prescribed (Tr. 207-08).

Plaintiff received treatment at Connellsville Counseling & Psychological Services from November of 2004 through at least January of 2006 (Tr. 181-206). Therapist Karen Barkley, LSW, started treating Plaintiff in November of 2004 (Tr. 204). Seven months later, on June 5, 2005, Koushik Mukherjee, M.D., performed an initial psychiatric evaluation of Plaintiff for chief complaints of depression and anxiety (Tr. 203-05). Plaintiff reported feelings of helplessness and hopelessness with suicidal ideation at times and claimed that she almost went to the hospital one week earlier due to worsening symptoms (Tr. 203). Plaintiff also reported that she lived with her son and boyfriend, whom she described as supportive (Tr. 204).

Dr. Mukherjee's mental status exam revealed that Plaintiff had significant anxiety with a depressed mood, but she was cooperative with good eye contact, was cognitively intact, had fair insight and judgment, and had intact impulse control (Tr. 204). The psychiatrist diagnosed major depressive disorder, recurrent, severe without psychotic features, panic disorder with agoraphobia, and a Global Assessment of Functioning (GAF) Scale score of 45, indicating serious symptoms or a serious impairment in social, occupational, or school functioning (Tr. 205).[3] Dr. Mukherjee prescribed Celexa in lieu of Effexor and recommended continued individual therapy with Ms. Barkley (Tr. 205).

On September 22, 2005, Plaintiff informed Ms. Barkley that she had been taking Oxycontin as prescribed by her pain clinic (Tr. 206). Ms. Barclay noted that Plaintiff stopped taking the medication two weeks earlier and had withdrawal symptoms (Tr. 206). Progress notes dated September 22, 2005, indicate that Plaintiff was addicted to Oxycontin and those dated October 31, 2005, note that Plaintiff was still taking Oxycontin (Tr. 192).

In a letter dated November 10, 2005, Dr. Mukherjee stated that Plaintiff, who he noted had been diagnosed with major depressive disorder and panic disorder, was frequently anxious and upset at the office and had been trying to discontinue use of an addictive back pain reliever (Tr. 191). Dr. Mukherjee also indicated that Plaintiff would not be able to successfully complete a daily training program (Tr. 191). On that same date, Ms. Barkley noted that Plaintiff was cutting back on the Oxycontin but was not agreeable to attending inpatient detoxification (Tr. 206).

---

[3]      The Global Assessment of Functioning(GAF) scale refers to the clinician's judgment of the individual's overall level of functioning. Diagnostic and Statistical Manual of Mental Disorders 32, 34 (DSM-IV) (4th ed. 1994).

Dr. Mukherjee completed a mental status questionnaire form on January 17, 2006, (Tr. 181-83), wherein he diagnosed major depressive disorder, recurrent, severe without psychotic features and, in Axis III, crushed vertebrae (Tr. 181). He again assessed a GAF of 45 (Tr. 181). Dr. Mukherjee indicated that Plaintiff responded well in counseling sessions and was willing to learn new skills, but struggled with following through with techniques out of session (Tr. 181). The psychiatrist reported that Plaintiff made some progress in the past 12 months and had a fair prognosis if she continued treatment (Tr. 181).

Dr. Mukherjee also opined that Plaintiff's fatigue, feelings of worthlessness, occasional suicidal thoughts, and diminished ability to think and concentrate caused significant impairment in social and occupational settings, while her panic disorder symptoms caused her to avoid most social situations (Tr. 182). Dr. Mukherjee noted that Plaintiff claimed that her symptoms had been at this level for several years and indicated that Plaintiff presented all of the same symptoms when she began therapy in December of 2004. (Tr. 182). The psychiatrist also noted that Plaintiff was often tearful and frequently decompensated sitting in his own waiting room and became visibly anxious at the mention of social situations which she may have to confront (Tr. 183). Dr. Mukherjee concluded that Plaintiff's symptoms precluded her from working eight hours a day, five days a week and that Plaintiff would not be able to function in a routine job setting ten or more days per month due to exacerbation of psychologically based symptoms (Tr. 183).

Dr. Mukherjee indicated on an accompanying Functional Limitations form that Plaintiff had a moderate impairment in her ability to perform ordinary daily activities, a marked impairment in her ability to socially function in a work setting, and an extreme impairment in

concentration, persistence, and task completion (Tr. 184).

### C.    Hearing Testimony and ALJ Decision

At the administrative hearing, Plaintiff testified that she was born on August 20, 1970, and, thus, was 35 years old at the time (Tr. 221).  Plaintiff also testified that she has been divorced since 1993 or 1994 and lives with her fourteen year old son on one floor of a single family home (Tr. 220-22).  Although certain records indicated that Plaintiff was also living with her boyfriend, she explained that he only comes and stays, albeit "pretty regularly" -- about three or four days a week -- but does not live there on a regular basis (Tr. 222-23).

Plaintiff also testified that her son has a dog, that there are five steps leading up to her house, that she has a washer and dryer on the premises and that she has a valid driver's license, although she only drives once or twice a week to go to counseling or pick up a few things at the grocery store (Tr. 223-25).  Plaintiff allowed that she has two brothers and two sisters, all of whom live close by and whom she sees "from time to time" (Tr. 225).

Plaintiff testified that she currently gets $179.00 a month from public assistance and also gets food stamps (Tr. 225-26).  She indicated that she pays $300.00 a month toward her rent which she is able to meet because her son is on SSI (Tr. 226).  Plaintiff also testified that she dropped out of high school in the twelfth grade and never took any steps to receive a GED or to enroll in any vocational classes (Tr. 227).  Plaintiff indicated that she last worked in a temporary position at Sony for almost a year, packing and unpacking parts, but quit in 1999 when her depression started to get worse and has not worked since (Tr. 227-29).  Plaintiff testified that she quit rather than be fired as she was calling off a lot and not doing the job as well (Tr. 228-29).  It appears that Plaintiff had no other employment in 1999 and never tried to return to Sony (Tr.

229).

Plaintiff also testified that in 1998 she worked at Seven Springs making pizzas for a couple of weeks but couldn't handle the job, and that in 1997 she worked for a period of time as a runner getting office and cleaning supplies for a company called Disaster Specialists that assisted people in cleaning up after floods (Tr. 229-31). Plaintiff said that she quit that job because it was too far to travel and she didn't have a vehicle at the time (Tr. 231). Although Plaintiff apparently had some earnings working for a temporary agency in 1997 and 1998 she could not recall what she did, but did recall earning some wages working at a company boxing up envelopes (Tr. 231-32). Plaintiff also worked as a cashier for about four months in 1996 at an Ames, but quit because she couldn't handle the stress dealing with customers (Tr. 232). Plaintiff could not recall any other jobs that she may have had in the prior fifteen years (Tr. 232).

When asked why she believed she was unable to work, Plaintiff testified that it was because of her nervousness and her depression and because she has anxiety but not because of any physical problems (Tr. 233).

Plaintiff indicated that she was presently seeing Dr. Kosheck once a month and that while he had initially prescribed 75mg of Effexor for her he later increased it to 150mg a day and then 150mg twice a day (Tr. 233-34). Plaintiff testified that she also sees a counselor once a week, one on one, who teaches her breathing and relaxation techniques for when she gets anxious which has helped somewhat but not totally (Tr. 233-35).

Plaintiff testified that she has not looked for any work since October of 2004, because she is "just scared" and doesn't like to go out much (Tr. 235).

It also appears that Plaintiff saw several doctors in the past for back problems

stemming from an injury when she was a teenager and had not only received injections in her back but was taking Oxycontin. Although Plaintiff testified that she subsequently quit taking the Oxycontin because she thought it was making her more depressed and because she read about how addictive it was, she also testified that she does not feel any less anxious or depressed since she stopped taking the medication and her back hurts her a lot (Tr. 235-37). Plaintiff also allowed that she stopped getting the injections in her back because her medical card wouldn't cover the pain specialist anymore (Tr. 237).

When asked about her daily activities, Plaintiff testified that she gets up in the mornings to send her son off to school, then prepares dinner for that day, cleans the house, does the laundry and the dishes and stays in the house (Tr. 237-38). Plaintiff indicated that she talks to her family and that they come to the house a good bit (Tr. 238). It also appears that Plaintiff's son had to repeat eighth grade and is in emotional support classes which requires her to have telephone conferences with his teachers (Tr. 238). Plaintiff testified that she hasn't been to a parent-teacher conference in a while but meets with his teachers once a year to review his IEP plan (Tr. 238-39). Plaintiff also testified that she doesn't attend any of her son's school activities and that he was not doing very well in school again although she tries to ask him about his assignments and checks to see that he's done his homework (Tr. 239).

With respect to special activities, Plaintiff testified that she did not go on a vacation the past summer and that she doesn't really get together with her siblings at holidays stating that she has a small dinner at her house and "they might stop in" (Tr. 239-40). Plaintiff testified that she and her boyfriend mainly go for rides to get her out a little bit, eat out very rarely, sometimes visit with friends and that she and her boyfriend and son sometimes go

shopping together (Tr. 240-41).   Plaintiff also testified that she smokes almost two packs of cigarettes a day and, although she had tried to cut back at the suggestion of her counselor and/or psychiatrist, she has never totally quit (Tr. 241).   Plaintiff said that the last time she drank alcohol was over a year ago, that she stopped because she thought it might be a factor with her depression and that she has felt somewhat less depressed as a result (Tr. 242).   Plaintiff allowed that she had been addicted to Oxycontin when she started seeing her current psychiatrist in September of 2005 and that she quit taking it after he suggested that she stop (Tr. 242-43).

Plaintiff also reiterated that she did not feel that she could work at Sony as she had before, even though she was no longer drinking or using drugs, because her depression was still there and she still has bad days that made her undependable (Tr. 243-44).

Upon examination by her attorney, Plaintiff again indicated that in the last year she started taking 75mg of Effexor once a day, which was then increased to 150mg once a day and then to 150mg twice a day (Tr. 244-45).   Plaintiff testified that she has panic attacks two or three time a week and that they last at least ten or fifteen minutes during which she is unable to breath, gets bad chest pains, gets light headed, feels like she is going to collapse and gets sick to her stomach (Tr. 245, 254).   Afterward, plaintiff testified, she feels groggy, "literally drained," and gets headaches that sometimes cause her to actually get sick and have to lie down for three to four hours (Tr. 245-46).   Plaintiff indicated that her therapist suggested that she sit down, try to relax and do breathing techniques when she has a panic attack, which plaintiff allowed only helps a little, sometimes (Tr. 254-55).   Plaintiff also stated that her depression has caused her to lose interest in things and feel isolated in that she doesn't like to do much or go out very often (Tr. 246).   It was also Plaintiff's testimony that some nights she is unable to sleep at all and then will

sleep for twelve to fourteen hours at a time (Tr. 246-47). Plaintiff testified that the panic attacks

happen both at home and when she's out and that she is unable to fix dinner or do her house

work afterward (Tr. 247, 254).

Plaintiff indicated that the Effexor gives her an upset stomach and makes her

lightheaded and that her doctor told her that if the increased dosage does not help he would try a

different medication (Tr. 247-48). He also instructed Plaintiff to continue to see her counselor

which she is doing once a week (Tr. 248).

Upon further questioning by the ALJ, Plaintiff said that her counseling sessions

help her deal with issues and that she does not remember whether she followed up on

recommendation made by the Department of Public Assistance in September of 2003 that she be

tested to see what her interests are and research careers that are inline with those interests (Tr.

248-49). Plaintiff also represented that when she's home and not doing other things she watches

television but does not read and that when she goes shopping she sometimes makes lists so that

she doesn't forget what she needs (Tr. 249-50).

A VE was also called to testify at the hearing and categorized Plaintiff as a

younger individual with a limited education and categorized her past work as a hand packer, a

cashier and her other jobs as a general laborer at the light, unskilled level (Tr. 251-52). When

asked to assume that the claimant had the ability to do medium work from an exertional

standpoint and was limited to jobs which would require only occasional contact with co-workers

and supervisors and the general public, the VE testified that whether or not she could perform her

past relevant work would depend on whether she was in a space where she had to be next to other

individuals on a constant basis. The VE allowed that she could do factory work but if she had

more than occasional contact with others or was next to anyone on a regular basis she could not perform her hand packing job at Sony or any of her other past work (Tr. 252).

In response to a hypothetical question regarding an individual of the same age, education, and work experience as Plaintiff who could perform at the medium exertional level with only occasional contact with co-workers, supervisors and the general public, the VE testified that such a person could perform unskilled work as a production helper and that those jobs, even reduced in half to accommodate the occasional contact with co-workers limitation, exist in significant numbers in the national and regional economy (Tr. 253). The VE was then asked whether there were unskilled jobs at the light level that such an individual could perform and responded that jobs such as a hotel/motel cleaner, a mail clerk and a price marker could be performed and that those jobs existed both nationally and regionally, which the VE identified as all of West Virginia, western Maryland, western Pennsylvania and eastern Ohio (Tr. 253-54). Taking that same individual with the additional limitation of being limited to simple, routine, one to three step tasks, the VE testified that those same jobs would be available (Tr. 254). However, if that same individual was also limited by having to be off task for two hours out of an eight hour work day because of his or her impairments or because of the medication he or she was taking, or if the individual had to be absent from work three days a month, the VE testified that there would not be any full-time, unskilled jobs that such a person could perform in the national or regional economy (Tr. 255-56).

In response to questioning by Plaintiff's counsel, the VE allowed that with respect to the entry level positions at issue, an employer typically gives an individual two fifteen minute breaks during the day, a half hour for lunch, up to two days absence a month and may require the

individual to be on task approximately 90% of the time (Tr. 256). Counsel then attempted to ask

if someone's mental impairments affected their daily activities to the point where they were

unable to complete simple tasks on a consistent basis, would that person be able to perform either

medium or light work on a regular and continuous basis. Finding that questions posed to the VE

should revolve around the claimant's ability to perform job activities and not daily activities, the

ALJ disallowed the question (Tr. 256-261).

Based on this evidence the ALJ concluded that although Plaintiff suffers from low

back strain, borderline intellectual functioning, anxiety and depression, all of which he found

"severe" within the meaning of the regulations, he also found that she did not have an

impairment or combination of impairments that meets or equals one of the listed impairments in

20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 15-20, Findings No. 2, 3). The ALJ also found

that Plaintiff had the residual functional capacity ("RFC")[4] to perform simple, routine, repetitive

light work with the additional limitations of having minimal interaction with the general public

and only occasional contact with supervisors and co-workers (Tr. 20-21, Finding No. 4). Finally,

the ALJ concluded that while Plaintiff was unable to perform any past relevant work, considering

her age, education, work experience and RFC she was capable of performing jobs such hotel

cleaner, private mail clerk and price marker, all of which existed in significant numbers in the

national economy, and, thus, was not disabled as defined under the Act (Tr. 22-23, Findings No.

5, 9, 10).

### D.    Standard of Review

Under the Act, disability is defined in terms of the effect an impairment has on an

---

[4]    A claimant's "residual functional capacity" is what he can do despite the limitations
caused by his impairments. <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 40 (3d Cir. 2001).

individual's ability to function in the work place. 42 U.S.C. § 423 (d)(1)(A), (2)(A). See Heckler v. Campbell, 461 U.S. 458, 460 (1983). Specifically, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). See Barnhart v. Walton, 535 U.S. 212 (2002). Thus, to establish that he or she is entitled to SSI benefits, the plaintiff has the burden of showing that he or she has a medically determinable impairment that is so severe that it prevents him or her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423 (d)(1)(A). See Hecker v. Campbell, 461 U.S. at 460.

In reviewing the administrative determination by the Commissioner regarding a plaintiff's disability, the question before the court is whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987). Substantial evidence is defined as less than a preponderance and more than a mere scintilla. Richardson, 402 U.S. at 402. If supported by substantial evidence, the Commissioner's decision must be affirmed. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

A five-step process is used to determine disability eligibility. See 20 C.F.R. §§ 404.1520(a) and 416.920(a).[5] Here, as previously discussed, the ALJ determined that Plaintiff

---

[5]     The five-step sequential evaluation process for disability claims requires the Commissioner to consider whether a claimant: (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his past relevant work, and (5) if not, whether he can perform any other work in the national economy. Id.

was not disabled at the fifth step, finding that although Plaintiff suffered from severe

impairments and was unable to perform her past relevant work, the Commissioner had

nevertheless met his burden of proving that, considering Plaintiff's RFC, age, education, and past

work experience, she could perform work that exists in significant numbers in the regional or

national economy. 42 U.S.C. § 416.960(c). See Bowen v. Yuckert, 482 U.S. 137, 146 n. 5

(1987); Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

**E.    Discussion**

Presently before the Court are cross-motions for summary judgment in which the

parties dispute whether or not the Commissioner's finding that Plaintiff is not disabled as defined

under the Act is supported by substantial evidence. Plaintiff contends that the ALJ erred by not

giving substantial weight to the opinion of Plaintiff's treating psychiatrist, Dr. Mukherjee, who

diagnosed Plaintiff as suffering from Major Depressive Disorder, Recurrent, Severe, without

psychotic features and Panic Disorder with Agoraphobia, and concluded that she would not be

able to function eight hours a day, five days a week in an occupational setting as she would be

likely to miss ten or more days per month due to exacerbation of her symptoms. Plaintiff, in

particular, faults the ALJ for: (1) relying on the opinions of the state agency psychologists who

merely reviewed Plaintiff's file without the benefit of the full record; (2) concluding that Dr.

Mukherjee "accepted everything the claimant told him without question," where there is no

evidence of record to support such a conclusion; (3) relying on his own assessment of Plaintiff's

psychological tests; (4) finding that Plaintiff "hid" her addiction to Oxycontin from Dr.

Mukherjee absent any support in the record; (5) mischaracterizing and misreporting Plaintiff's

testimony regarding her daily activities; and (6) not accurately portraying Plaintiff's impairments

and limitations as found by Dr. Mukherjee in the hypothetical posed to the VE.

In response, the Commissioner argues that the ALJ was justified in not crediting Dr. Mukherjee's opinion because it was based on the depression questionnaire that Plaintiff had only completed one month earlier and because Dr. Mukherjee's reports of decompensation in his waiting room were unaccompanied by any reports of delusions, hallucinations or inpatient care. The Commissioner also reiterates the ALJ's finding that Dr. Mukherjee simply accepted the extreme restrictions checked off by the Plaintiff at face value without realizing that she was exaggerating her symptoms and points to the fact that Dr. Gorman found in his report dated September 24, 2003, that Plaintiff was able to follow directions, displayed good attention skills, was cooperative and would be able to interact more positively with others and deal with stressors if she stayed in counseling (Tr. 133, 136). The Commissioner also argues that it is misleading for Plaintiff to suggest that the ALJ *relied* on the reports of the reviewing state agency consultants when he stated in his decision only that he *accepted* their reports.

It is well settled that,

A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Where ... the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion.

Morales v. Apfel, 225 F.3d 310, 317-18 (3d Cir. 2000) (internal citations omitted).  See Jones v.

Sullivan, 954 F.2d 125, 129 (3d Cir. 1991) (A treating physician is not entitled to controlling

weight when his or her opinion is conclusory and inconsistent with the other medical evidence).

See also  20 C.F.R. § 416.927(d)(3) (To be afforded controlling weight, the opinion of a

physician must be "well supported by medically acceptable clinical and laboratory diagnostic

techniques and ... [be] not inconsistent with the other substantial evidence").

   Here, Plaintiff first faults the ALJ for refusing to credit Dr. Mukherjee's opinion

that Plaintiff's on-going struggle with anxiety and depression would prevent her from working

eight hours a day five days a week, instead relying on the opinion of the state agency

psychologist, Dr. Glover, who merely reviewed Plaintiff's file and did so without the benefit of

the full record.  While it is true that an ALJ may rely on the opinions of non-examining

physicians, even when those opinions contradict the opinion of a treating physician, those

opinions must be consistent with and supported by the record.  Jones v. Sullivan, 954 F.2d at

129.  The reviewing state agency consultant in the instant case, however, reviewed Plaintiff's file

in March of 2005 which clearly did not include Dr. Mukherjee's reports which are dated June of

2005 and January of 2006.  Nor does it appear that Dr. Glover had the benefit of the other records

from Connellsville Counseling and Psychological Services or those of Plaintiff's therapist with

whom she treated from November of 2004 until at least the time of the hearing.

   Indeed, it is unclear precisely what records were relied upon by Dr. Glover, who

indicates only that Plaintiff failed two mental status exams and that "[a]ppropriate reminder and

follow-up procedures were completed" (Tr. 178).  Moreover, Dr. Glover did not find that

Plaintiff was able to engage in gainful activity but merely concluded that there was "insufficient

medical evidence in file [sic] to indicate that the claimant would not be able to perform work activity" (Tr. 178). In fact, in rating Plaintiff's functional limitations, other than indicating that Plaintiff had one or two repeated episodes of decompensation of extended duration, Dr. Glover was unable to assess whether Plaintiff's limitations were mild, moderate, marked, extreme or even non-existent, but instead checked the box indicating that there was insufficient evidence to properly rate them. Under these circumstances, it appears improper for the ALJ to have discounted Dr. Mukherjee's opinion in favor of the Dr. Glover's evaluation when Dr. Glover did not have the benefit of Dr. Mukherjee's reports or the full record before him and was otherwise unable to draw any conclusions regarding Plaintiff's limitations. See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995) (Finding that the agency RFC forms could not constitute substantial evidence that the claimant was capable of performing a full range of light work because they were not based on the full record). See also Rivera v. Barnhart, 2005 WL 713347 at *7-8 (E.D. Pa. March 24, 2005) (Finding that the psychiatrist's testimony upon which the ALJ relied was not based on the entire record and, thus, the ALJ's rejection of the claimant's treating psychiatrists assessment was not supported by substantial evidence). As such, it appears that the ALJ's refusal to credit Dr. Mukherjee's opinion in favor of Dr. Glover's assessment was not based on substantial evidence.[6]

        Plaintiff also challenges the ALJ's finding that Dr. Mukherjee's opinion was unworthy of credence because he "accepted everything the claimant told him without question,"

---

[6]     We note here that the Commissioner's argument that the ALJ did not rely on the reports of the state consulting psychologist but rather merely "accepted" their opinions is unavailing. Not only does it fail to address Plaintiff's argument that the state consultants did not have the benefit of the full record when they rendered their opinions, but having noted that he "accepted" their opinions, the ALJ necessarily took them into consideration and, thus, at least to some extent relied on them.

as being unsupported by the record.  We agree.  Although Dr. Mukherjee stated in his January

2006 report that his opinion was based on self- report, he also stated that it was based on the

results of the "Burns Anxiety" and "Depression Scale" testing he conducted.  While those tests

consist of questions posed to Plaintiff regarding her symptoms and feelings, and while Plaintiff

indicated without exception that her symptoms were either moderately severe or severe, there is

no indication in the record that Dr. Mukherjee accepted each and every response in evaluating the

tests.  The mere fact that Dr. Mukherjee concluded that Plaintiff was unable to function in a work

setting eight hours a day, five days a week does not, standing alone, suggest that he accepted

everything that Plaintiff reported.  This is particularly true here where Dr. Mukherjee had been

treating Plaintiff and she had been seeing a therapist at the same facility on a bi-weekly basis for

over a year at the time he rendered his opinion.  See Rivera v. Barnhart, 2005 WL 713347 at *8

(In which the Court presumed that the claimant's treating psychiatrist considered the treatment

notes of the claimant's therapist in rendering his opinion as they worked at the same mental

health agency).  It would therefore appear that the ALJ's conclusion that Dr. Mukherjee was

undiscriminating in his acceptance of Plaintiff's reported symptoms does not appear to be

supported by substantial evidence either.

   Indeed, the only evidence to which the Commissioner points to support his

position is Dr. Gorman's report in which he found that Plaintiff was able to follow directions,

displayed good attention skills, was cooperative and would be able to interact more positively

with others and deal with stressors if she stayed in counseling.  Dr. Gorman's report, however, is

dated almost two and a half years earlier -- prior to the time frame at issue in these proceedings --

and also notes that feelings of anxiety were evident throughout the session, that Plaintiff is likely

to be plagued by worry to the degree that her abilities to concentrate and attend are significantly compromised, and that her reported difficulties are consistent with a significant depressive experience (Tr. 134). Dr. Gorman concluded that Plaintiff's personality assessment suggested that she frequently experiences difficulties involving anxiety and symptoms of depression which may seriously impact her ability to effectively deal with issues and problems that arise on a day-to-day basis (Tr. 135). Thus, Dr. Gorman's report is not inconsistent with Dr. Mukherjee's findings and does not appear to provide the basis for impugning Dr. Mukherjee's assessment of Plaintiff's reported symptoms.

Moreover, rather than point to evidence of record to support his conclusion that Dr. Mukherjee's improperly credited Plaintiff's reported symptoms, it appears that the ALJ merely imposed his own interpretation of Plaintiff's tests and reported symptoms. After noting that Plaintiff had completed the "Burns Anxiety" and "Depression Scale" questionnaires and that she had rated her depressive symptoms at one of the highest two levels in every instance, the ALJ then concluded that this indicated some symptom exaggeration remarking that, "[s]urely of the 48 symptoms described the claimant did not have all of them, and if so not to the severity she alleged" (Tr. 17). The ALJ, however, does not point to any evidence to support his conclusion, which appears to be based on his own opinion or assessment of Plaintiff's test responses.[7] As found by the Court of Appeals for the Third Circuit, however,

[t]his court has repeatedly held that an ALJ is not free to set his

---

[7]     Although the Commissioner argues that, "[i]n light of Plaintiff's daily activities, the ALJ could only conclude that Plaintiff's questionnaire responses indicted symptom exaggeration," the ALJ does not discuss Plaintiff's daily activities in conjunction with this issue. See Def.'s Brief at 14; Tr. 17. Moreover, even if he had, it still does not provide evidence that Dr. Mukherjee was completely uncritical of Plaintiff's reported symptoms.

> own expertise against that of physicians who present competent
> medical evidence.  Fowler v. Califano, 596 F.2d 600, 603 (3d Cir.
> 1979).  See also Rossi v. Califano, 602 F.2d 55 (3d Cir. 1979);
> Gober v. Matthews, 574 F.2d 772, 777 (3d Cir. 1978).  Indeed, we
> have previously warned that, "[i]n cases of alleged psychological
> disability, such lay observation [by an administrative judge] is
> entitled to little or no weight."  Kelly v. Railroad Retirement Bd.,
> 625 F.2d 486, 494 (3d Cir. 1980) (*quoting Lewis v. Weinberger*,
> 541 F.2d 417, 421 (4th Cir. 1976) ).

VanHorn v. Schweiker, 717 F.2d 871, 874 (3d Cir. 1983).  See Morales v. Apfel, 225 F.3d at

317-18.  As in VanHorn, the ALJ in the instant case appears to have ignored the opinion of

Plaintiff's treating psychiatrist in favor of his own conclusion that Plaintiff exaggerated her

symptoms to the point that her tests, and thus Dr. Mukherjee's opinion, were without

significance.  As such, the ALJ acted impermissibly.  Id.

Plaintiff also challenges certain findings made by the ALJ that reflect on her

credibility.  In particular, Plaintiff cites to the ALJ's finding that she was somehow disingenuous

because she denied any substance abuse to her counselor, Ms. Barkley, in January of 2005 and  to

Dr. Mukherjee in June of 2005, but then reported to her counselor "for the first time" in

September of 2005, that she had been taking Oxycontin.  Indeed, as noted by the ALJ, Ms.

Barkley reported in September of 2005 that Plaintiff had stopped taking the medication two

weeks earlier and was exhibiting symptoms of withdrawal.  She also indicated then, and again in

October, that Plaintiff was addicted to the medication, and, in November of 2005, Dr. Mukherjee

reported that Plaintiff had been trying, apparently unsuccessfully, to discontinue the Oxycontin

but was cutting back.

The record shows, however, that Plaintiff was first prescribed Oxycontin by Dr.

Navarro in April of 2005 for pain and stiffness in her neck and lower back (Tr. 208).  As such,

when she reported to Ms. Barkley in January of 2005 that she was not abusing any substances she was not yet taking the Oxycontin. Moreover, when she denied any substance abuse in June of 2005, she had only been taking the Oxycontin for two months and was unlikely to have been, or considered herself to have been, addicted. Thus, at that time, Plaintiff was simply taking a prescribed pain medication which is not the equivalent of "abusing a substance," and denying any substance abuse under those circumstances does not appear to be inconsistent or disingenuous. Nor does the fact that Plaintiff subsequently reported -- three months later, in September of 2005 -- that she may be addicted to the Oxycontin because she was having trouble discontinuing the medication, render her earlier statements denying substance abuse incredible or selective as found by the ALJ. Thus, while credibility determinations as to a claimant's testimony regarding her limitations are properly left to the ALJ, see VanHorn v. Schweiker, 717 F.2d at 873, the conclusions drawn by the ALJ in this case regarding Plaintiff's selective reports regarding her use of Oxycontin is not supported by the record.

Similarly, although the ALJ found that Plaintiff's testimony regarding her daily activities was inconsistent with her claims that she was unable to work on a regular and continuous basis, review of the record is to the contrary. The ALJ particularly relied on the daily activities questionnaire that Plaintiff completed in December of 2004, in which she stated that she spent a great deal of time in bed when under stress; that she rarely cooked for her family and mostly ordered out; that she did some household chores but frequently had to stop and rest due to back pain; that she had to lean on the shopping cart when buying groceries; that she needs help from her son to lad and unload the groceries; and is unable to make too may purchases due to a combination of back pain and anxiety in the store (Tr. 16; 76-85). The ALJ then compared these

responses to portions of Plaintiff's hearing testimony in which she stated that her daily activities include getting her son off to school, straightening the house, preparing her dinner, laundering clothes and washing dishes. The ALJ also noted that although Plaintiff stated that she did not go out often, she admitted that she occasionally went shopping with her boyfriend and son, would go for a ride with her boyfriend, on rare occasions would have dinner at a fast food restaurant, drives to the store and medical appointments, visits with family and entertains on holidays (Tr. 16-17, 21). The ALJ also took note of Plaintiff's testimony that she was able to help her son with his homework, discuss his educational plan with his teachers and attend an annual meeting with them to determine if he is meeting his goals (Tr. 20, 21). The ALJ concluded that, "[s]urely, if the claimant is able to go to busy eateries, shop in department stores or take long car rides she should be able to interact in a work setting, remain in a stationary position and perform work-related activities on a regular and continuing basis" (Tr. 21).

Review of Plaintiff's hearing testimony as a whole, however, shows that she rarely leaves the house, her boyfriend takes her on rides just to get her out of the house, and she does not attend any regular parent-teacher conferences or any of her son's school activities. Moreover, Plaintiff did not testify that she "entertains" on holidays but only that she has a small dinner on holidays and that her siblings "might" stop in. Similarly, Plaintiff merely testified that she tries to ask her son about his assignments and checks to see that his homework is done, not that she helps him with his homework.

As well, Plaintiff testified that she has panic attacks two or three time a week and that they last at least ten or fifteen minutes during which she is unable to breath, gets bad chest pains, gets light headed, feels like she is going to collapse and gets sick to her stomach (Tr. 245,

254).   Afterward, plaintiff testified, she feels groggy, "literally drained," and gets headaches that sometimes cause her to actually get sick and have to lie down for three to four hours (Tr. 245-46).   Plaintiff also testified that because of her depression she feels isolated and doesn't go out very often and that some nights she is unable to sleep at all and then will sleep for twelve to fourteen hours at a time (Tr. 246-47).   Plaintiff testified that the panic attacks happen both at home and when she's out and that she is unable to fix dinner or do her house work afterward (Tr. 247, 254).   Plaintiff further testified that she sees her counselor once a week and a psychiatrist, who has prescribed 150 mg of Effexor twice a day, once a month. (Tr. 228-29, 233-34, 244).[8]

Although plaintiff did allow that her daily activities include straightening the house, doing the dishes and laundry and preparing dinner, she also testified that she has good days, when she is presumably able to do these things, and bad days when presumably she is not (Tr. 243).   Moreover, although Plaintiff also testified that she goes shopping with her boyfriend and son and has dinner at fast food restaurants, she stated that she only did these things "occasionally" and "rarely."   Thus, it does not appear that Plaintiff's testimony is inconsistent with her earlier questionnaire responses as found by the ALJ.

Moreover, in Rieder v. Apfel, 115 F. Supp. 2d 496, 504-05 (M.D. Pa. 2000), the ALJ, like in the instant case, also found the plaintiff's claims that she was unable to work incredible based, in part, on the fact that she shops for groceries, cleans her house, does laundry, washes the dishes, cooks, drives her car, plays cards, plays billiards, watches television, listens to

---

[8]        Further, although the Commissioner has argued that Plaintiff "changed her story" when describing panic attacks in response to questions from her attorney that she had not described when answering questions posed by the ALJ, it is clear from the transcript that the ALJ did not ask Plaintiff about her panic attacks and that she appropriately responded to the ALJ's questions about her daily activities.

music, goes for walks, visits relatives, and reads. Id. at 504. The Court held that the ALJ's assessment was not based on substantial evidence opining that:

> First, we do not find that the fact that the plaintiff is able to enjoy herself with her disability is a ground for finding that she has no credibility and has the ability to work. In addition, the law does not require a complete restriction from recreational and other activities as a prerequisite to a finding of disability. *Smith [v. Califano]*, 637 F.2d [968,] 968 [(3d Cir. 1981)]; *Wright v. Sullivan*, 900 F.2d 675 (3d Cir.1990).

> The ALJ seems to have relied heavily on the fact that claimant had testified she did household activities and occasionally involved herself in recreational activities. Yet, statutory disability does not mean that a claimant must be a quadriplegic or an amputee. Similarly, shopping for the necessities of life is not a negation of disability. "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Smith*, 637 F.2d at 971-72. The plaintiff's activities are minuscule when compared to a plethora of cases which have held that there was total disability even when the claimant was more active.

> It is well established that sporadic or transitory activity does not disprove disability. *Yawitz v. Weinberger*, 498 F.2d 956 (8th Cir.1974). In that case, the plaintiff suffered from disabling headaches, although he drove a car, took cross country camping trips and did considerable handiwork around the house. In the instant case, the plaintiff did not perform any activities as taxing as cross country camping trips, but rather performed activities necessary to live together with a few sedentary recreational activities. In the *Yawitz* case, the court overturned the ALJ and ruled the claimant disabled. *Id.* Other courts have determined that sporadic and transitory activities may demonstrate not an ability but an inability to engage in substantial gainful activity. *Wilson v. Richardson*, 455 F.2d 304, 307 (4th Cir. 1972).

Id. at 504-05. See Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001) ("Finding that "sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity").

Thus, the fact that Plaintiff is able to engage in certain activities does not appear to provide the support for the ALJ's findings that Plaintiff is also able to engage in substantial gainful activity.

Because the Commissioner's disability determination is not supported by substantial evidence, it is recommended that the pending motions for summary judgment be denied and that the matter be remanded to the Commissioner for further consideration consistent with this opinion.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Any party opposing the objections shall have seven (7) days from the date of service of the objections to respond thereto. Failure to timely file objections may constitute a waiver of any appellate rights.

Respectfully submitted,

/s/  *Amy Reynolds Hay*
United States Magistrate Judge

Dated: 3 December, 2007

cc:    Hon. Terrence F. McVerrry
       United States District Judge

       All counsel of record by Notice of Electronic Filing